IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| MOUNTAIN VALLEY PIPELINE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 7:18-cv-00609 |
| | ) | |
| 10.67 ACRES OF LAND, OWNED BY | ) | By: Elizabeth K. Dillon |
| DOE CREEK FARM, INC., | ) | United States District Judge |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| MOUNTAIN VALLEY PIPELINE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 7:18-cv-00611 |
| | ) | |
| 0.18 ACRES OF LAND, OWNED BY | ) | By: Elizabeth K. Dillon |
| GEORGIA LOU HAVERTY, | ) | United States District Judge |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Mountain Valley Pipeline (MVP) is constructing an interstate natural gas pipeline. It commenced a condemnation action under the Natural Gas Act, 15 U.S.C. § 717 *et seq.*, to acquire a permanent easement and temporary easements on numerous properties, including these properties located in Giles County, Virginia, and owned by Doe Creek Farm, Inc. and Georgia Lou Haverty. Doe Creek Farm is an agritourism property, with uses including a kennel, a retail orchard operation, and an event venue. On March 8, 2018, the court entered an order in the primary condemnation case, *Mountain Valley Pipeline LLC v. Easements to*

*Construct*, 7:17-cv-492 (W.D. Va.) (Dkt. No. 716), granting MVP immediate possession of the easements on this property. A trial on just compensation for the takings on the subject properties is scheduled to begin on November 19, 2019.

Before the court are five motions: (1) Landowners' motion to exclude the testimony of Kevin Wagner and Brian Murphy; (2) Landowners' motion to exclude the testimony of Wesley Woods; (3) Landowners' motion to exclude the testimony of Joseph Thompson; (4) MVP's motion to exclude the testimony of Steven Noble; and (5) MVP's omnibus motion in limine.

For the reasons set forth below, the court will deny the Landowners' motions to exclude Wagner, Murphy, and Woods; grant the Landowners' motion to exclude Thompson; and grant MVP's motion to exclude Noble. MVP's motion in limine will be granted in part and denied in part.

I. DISCUSSION

**A. Legal Standard**

The motions present various issues of just compensation in eminent domain cases as well as issues involving the qualification of experts and their reliability and relevance. Legal standards regarding the same are set forth herein.

**1. Just compensation for partial permanent takings, including severance damages**

The Takings Clause of the Fifth Amendment prohibits the taking of private property without just compensation. *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 536 (2005). When the government condemns private property for a public purpose, it must pay just compensation for that property. Just compensation is the monetary equivalent of the property taken, and the federal courts have employed the concept of "fair market value" to determine the condemnee's

2

loss.  *United States v. 564.54 Acres of Land*, 441 U.S. 506, 510–11 (1979); *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 473–74 (1973).

Unless otherwise proscribed by Congress, federal law governs "questions of substantive right, such as the measure of compensation" for federal courts in condemnation proceedings. *United States v. Miller*, 317 U.S. 369, 379–80 (1942).  *See also Tenn. Gas Pipeline Co. v. Permanent Easement for 1.7320 Acres*, No. 3:cv-11-028, 2014 WL 690700 (M.D. Pa. Feb. 24, 2014) (unpublished) (concluding that federal law applies in determinations of just compensation under the Natural Gas Act).  The Fourth Circuit defines just compensation in a case of partial taking as "the value of the land taken plus the depreciation in the market value of the remainder."  *United States v. 97.19 Acres of Land*, 582 F.2d 878, 881 (4th Cir. 1978) (citing *W. Va. Pulp & Paper Co. v. United States*, 200 F.2d 100, 104 (4th Cir. 1952)).  Moreover, "value [of the condemned land] is to be ascertained as of the date of taking."  *Miller*, 317 U.S. at 374.

In *West Virginia Pulp and Paper*, the Fourth Circuit recognized the well-settled principle that "whenever there has been an actual physical taking of a part of a distinct tract of land, the compensation to be awarded includes not only the market value of that part of the tract appropriated, but the damage to the remainder resulting from that taking, embracing, of course, injury due to the use to which the part appropriated is to be devoted."  200 F.2d at 102.  The court recognized that the landowner was damaged not only by the loss of the land, but also by the proposed use that caused depreciation to the remainder, and therefore was entitled to be awarded a sum that "would put it in as good position pecuniarily as it would have been if its property had not been taken."  *Id.* at 103.  The measure of this sum was "the value of the land taken plus the depreciation in the market value of the remainder due to the use made of the part taken."  *Id.* at 104.  *See also 97.19 Acres of Land*, 582 F.2d at 881 (citations omitted) (explaining

that severance damages to the remainder, if any, are measured as "the difference in market value of the residue before and after the taking").

   2. **Damages for perceived market negative influences**

In a previous opinion, this court analyzed the law with regard to testimony about damages resulting from perceived market negative influences, such as the perceived danger, or unsafe nature, of pipelines. *See Mountain Valley Pipeline, LLC v. 1.23 Acres of Land Owned by Eagle's Nest Ministries, Inc.*, Civil Action No. 7:18-cv-00610 (W.D. Va.), Dkt. No. 55; *Mountain Valley Pipeline, Inc. v. 6.50 Acres of Land Owned by Sizemore Inc. of Va.*, Civil Action No. 7:18-cv-00612 (W.D. Va.), Dkt. No. 66. The court will not repeat that entire analysis here, but merely incorporates it by reference. By way of summary, the court held that, to be admissible, an expert's opinions with regard to some hazard incident to the use of the property taken must be supported by some evidence that the hazards are reasonably probable and more than just speculative. Moreover, there must be a nexus between those hazards and/or the public perception in the marketplace—specifically, the marketplace for that property—and a diminution in value of the property. In other words, there must be a causal link between the hazard inherent in the taking and a direct loss in the marketplace. *United States v. 760.807 Acres of Land*, 731 F.2d 1443, 1448 (9th Cir. 1984); *see also Atl. Coast Pipeline LLC v. 0.07 Acres*, No. 3:18-cv-00006, 2019 WL 2527571, at *14–17 (W.D. Va. June 19, 2019) (excluding an expert environmental professional's opinion about a natural gas pipeline's effect on property value because the analysis was not linked to the specific property's value and was therefore irrelevant to the determination of just compensation).

   3. **Expert testimony**

Federal Rule of Evidence 702 and the standards established in *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), govern admissibility of expert testimony. Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Before considering whether a proffered expert's testimony is reliable, the court first determines whether the witness qualifies as an expert. A witness may qualify as an expert on the basis of "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The expertise must relate to the areas in which the expert is expressing opinions. *See Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 800 (4th Cir. 1989). Exclusion should occur only where all bases for expertise are lacking with regard to the issue for which the opinion is offered, and a proffered expert "need not be precisely informed about all details of the issues raised in order to offer an opinion." *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993) (quoting *Thomas J. Kline, Inc.*, 878 F.2d at 799).

While the test for exclusion may be a "strict one," *Kopf*, 993 F.2d at 377, some type of relevant expertise is nonetheless required. For example, where experience is one of the bases for a witness's expertise, the witness must "explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts." *Radiance Found., Inc. v. Nat'l Ass'n for the Advancement of*

5

*Colored People*, 27 F. Supp. 3d 671, 674 (E.D. Va. 2013) (alteration in original) (citations omitted). Additionally, a witness's expertise must be tailored, to some degree, to the specific opinions offered and the particular facts in the case; general expertise or knowledge on a broad topic or general field may be insufficient, depending on the facts of a case. *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 391–92 (D. Md. 2001) ("The fact that a proposed witness is an expert in one area, does not *ipso facto* qualify him to testify as an expert in all related areas.") (citing *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 247 (4th Cir. 1999)).

After ensuring that an individual qualifies as an expert, this court has an obligation under *Daubert* to act as a gatekeeper and ensure that any testimony concerning scientific, technical, or other specialized knowledge offered in support of a party's claim is "not only relevant, but reliable." 509 U.S. at 589; *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting same). The proponent of the testimony must establish its admissibility, although it need not prove its expert's theory is correct. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001); *Md. Cas. Co. v. Therm–O–Disc, Inc.*, 137 F.3d 780, 783 (4th Cir. 1998). First, the trial court must ask whether proffered scientific evidence is valid and reliable. *United States v. Barnette*, 211 F.3d 803, 815 (4th Cir. 2000). Second, the court asks whether the evidence will help the trier of fact, which is generally a question of relevance, or "fit." The court must ask if, assuming the evidence is reliable, it will "assist the trier of fact to understand or determine a fact in issue." *Md. Cas. Co.*, 137 F.3d at 783 (quoting *Daubert*, 509 U.S. at 592).

The court's role in limiting expert testimony is important: "due to the difficulty of evaluating their testimony, expert witnesses have the potential to be both powerful and quite misleading." *Cooper*, 259 F.3d at 199 (citations omitted). Indeed, "given the potential persuasiveness of expert testimony, proffered evidence that has a greater potential to mislead

than to enlighten should be excluded." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). Importantly, "[t]he gatekeeping role of the district court is particularly pronounced in condemnation proceedings under Rule 71.1." *United States v. 33.92356 Acres of Land*, 585 F.3d 1, 8 (1st Cir. 2009).

**B. Landowners' Motion to Exclude Wagner and Murphy**

Landowners move to exclude testimony by Kevin Wagner and Brian Murphy, employees of MVP's principal member, Equitrans Midstream. Wagner is a Regional Land Director for MVP. Murphy is identified as a "Landman III" who works for Wagner on the acquisition of easements and other land-related functions. Landowners argue that they should not be allowed to testify and give opinions as to the actual construction of the MVP project because neither qualify as experts in pipeline construction. Instead, their only experience with pipeline construction comes from periodically observing different pipeline construction sites and interacting with pipeline construction workers and supervisors in relaying concerns raised by landowners.

MVP responds that Wagner and Murphy are not giving opinions on pipeline construction, they are simply describing the construction process. Based on their experience, they know the process and the reclamation that will be completed. MVP also states that it may not have been necessary to list them as expert witnesses, but MVP did so to avoid objections for not doing so. MVP does not expect lengthy testimony from Wagner and will call Murphy only if Wagner is unavailable. Ultimately, while Wagner and Murphy do not work on the construction themselves, they know enough to describe the process.

Given MVP's concession that Wagner and Murphy will not be offering expert testimony, the court finds that Wagner and Murphy may testify as fact witnesses regarding the basics of

7

pipeline construction and reclamation. This testimony is relevant to describe what the project will look like when it is completed and will aid the jury in assessing the just compensation issue.

Landowners also object to testimony by these witnesses about a presentation prepared by MVP's Engineering Department relating to reclamation, inspection, and maintenance of the pipeline and right-of-way. Landowners object that the presentation is hearsay. MVP contends that Wagner and Murphy would not merely "parrot" the information in the presentation or use it as the basis of their testimony. Instead, they may use the presentation as demonstrative evidence to summarize and illustrate their testimony as to reclamation, maintenance, and inspection. In addition, MVP represents that they have personal knowledge of the information contained in the presentation. *See* Fed. R. Evid. 602. Based on these representations, the court will deny the motion to exclude the presentation without prejudice but may revisit the issue at trial.

## C. Landowners' Motion to Exclude Woods

MVP identified Woods as an expert who would testify about the December 2016 Myers & Woods study. Landowners argue that Woods' testimony should be excluded because he does not have any opinions about just compensation in this case. Even if Woods' testimony could be considered relevant, Landowners argue that the study does not meet the *Daubert* standard for reliability because there are several anomalies or were based on imperfections in the market.

MVP responds that the information in the study is admissible because their experts on value and damages, Samuel Long and Joseph E. Thompson, relied upon the Myers & Woods study in forming their opinions. MVP also argues that Woods' testimony will assist the jury in evaluating Long and Thompson's opinions on damages. Regarding the contents of the study, MVP argues that objections to the anomalies go to the weight of the evidence, not its admissibility. Moreover, Long and Thompson do not base their opinions on the alleged

anomalies in Myers & Woods.

The court finds that Woods' testimony may be admissible to the extent that it assists the jury in evaluating Long and Thompson's opinions on damages. Other areas of testimony, however, may be problematic, depending on the direction of Woods' testimony and the other evidence presented at trial. Therefore, the court will deny the motion to exclude without prejudice to revisiting these issues at trial.

**D. Landowners' Motion to Exclude Thompson**

Thompson used a sales comparison approach to value the subject properties before and after the taking. The sales comparison approach is a "recognized appraisal method" that "produces an estimated value for real estate by analyzing closed sales, listings or pending sales of properties that are similar to the subject property." *Gordon v. New England Cent. R.R.*, Case No. 2:17-cv-00154, 2019 WL 4069389, at *1, *5 (D. Vt. Aug. 27, 2019); *see also Rood v. Liberty Ins. Underwriters, Inc.*, Case No.: 2:16-cv-002586-JAD-NJK, 2019 WL 1506013, at *3 n.23 (D. Nev. Apr. 5, 2019) (explaining that "the sales-comparison approach, which compares land to other recently sold parcels with comparable characteristics," is "an appraisal methodology that is based on the economic Principle of Substitution, which sets forth that a prudent buyer will pay no more for a property than the cost of obtaining an equally desirable substitute on the open market"); *In re Hall*, 495 B.R. 393, 396 (Bankr. N.D. Ill. 2013) ("Under the sales comparison approach the appraiser conducts a search of a similar real estate market to the subject property in order to find properties in similar situations to determine the value of the property in question.").

Landowners argue that the sales comparison approach used by Thompson is unreliable because the three sales that he used for comparison are materially flawed.

9

Sale 1: Delfosse Vineyards & Winery.  This sale is problematic because it arose out of a business bankruptcy, not a market transaction between a willing buyer and a willing seller.  *See In re Beckham*, 447 B.R. 603, 609 (Bankr. E.D. Mo. 2011) ("Market value, as it is commonly understood, has no applicability in the forced-sale context; indeed, it is the very *antithesis* of forced-sale value . . . In short, fair market value presumes market conditions that, by definition, simply do not obtain in the context of a forced sale.") (quoting *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537–38 (1994)); *In re Alford*, 403 B.R. 123, 135 (Bankr. M.D. Fla. 2009) (explaining "the forced sale price of assets may be significantly lower than the fair market value").  As a result, Thompson adopted a different amount as consideration paid for the real estate for comparison purposes.  Moreover, the bankruptcy involved a business operated by the seller, and the sale appeared to involve the conveyance of personal property and nontangible property such as trademarks.  Thompson also failed to confirm the details of the transaction, and as a result, he was unaware that the buyers of the property had constructed a large new wedding reception building, replacing the former venue, a removable tent.  Purchase price includes not only what the buyer pays to the seller but also the buyer's expected costs in renovating or modifying the property.  Thompson failed to provide any basis for how he determined what adjustments to make or not make.  This renders his reliance on Sale 1 unfounded.

Sale 2: Former Camp Fincastle.  This property was purchased by an LLC of which Thompson himself is the sole owner.  Thompson included a $280,000 upward adjustment to account for planned expenditures of renovating the property to become a wedding and event venue (which he failed to do for sale one).  Landowners argue that the size of the adjustment is entirely unsubstantiated.   Moreover, the adjustment is Thompson's own creation, not market-based.

Sale 3: Virginia Mountain Vineyards. This sale is of a property already encumbered by a natural gas transmission line easement. This is improper because Thompson is using an after-condition sale to determine the value of the subject property in its before-take condition. In other words, it is improper and impermissible to use a property which was sold with a gas pipeline easement already on it to reflect the market value of Landowners' properties without such an easement. Also, similar to Sale 1, Sale 3 included the sale of certain personal property.

In addition to the issues with Thompson's sales comparison analysis, Landowners argue that Thompson has no market evidence as to damage of the subject properties. Instead, his analysis of damages is based on non-market information and unreliable data. Thompson relies on: a single paired sale from the Myers & Woods study to conclude that the taking diminishes the value by eight percent; the property selected as Sale 3 in his before-take valuation; a conversation with a property owner whose land had been encumbered by a natural gas pipeline easement for decades; and a call to a booking agent for the non-profit Virginia Horse Center, who was unaware of the pipeline's presence on the Center's property. This evidence is not reliable market data for the effects of a natural gas pipeline easement. Thompson does not establish a connection between this evidence and his conclusion on damages. *See, e.g.*, *Eagles Nest*, Civil Action No. 7:18-cv-00610 (W.D. Va.), Dkt. No. 55 at 13. Thompson failed to provide a causal link between the evidence (e.g., magazine articles, interviews with market participants) and his conclusion about damages, as in *Eagles Nest*.

Pursuant to *Daubert*, the court concludes that Thompson's methodology is unreliable and based on insufficient facts or data. It will be excluded.

### E. MVP's Motion to Exclude Noble

Noble's report contains information on the amount MVP paid for easements on two tracts in Summers County, West Virginia. MVP argues that this evidence should be excluded because it is not a fair indication of market value. *See Slattery Co. v. United States*, 231 F.3d 37, 41 (5th Cir. 1956). Landowners concede this point and will not elicit testimony about the amount paid for other easements. The amounts were included only as an "FYI" and were not used for purposes of valuation.

MVP also challenges the reliability of Noble's paired sales analysis. In a paired sales analysis, "the appraiser identifies pairs of sales that are as similar as possible for all but one factor. When the sales are compared, the difference in price is best explained by that particular feature that distinguishes the properties." *McCann Holdings, Ltd. v. United States*, 111 Fed. Cl. 608, 626 (2013). "The goal of a paired sales analysis is to isolate the effect that a certain feature, such as a natural gas pipeline, has on a property's market value." *Sabal Trail Transmission, LLC v. 0.589 Acres of Land*, Case No.: 3:16-cv-277-J-34JBT, 2018 WL 3655556, at *4 n.3 (M.D. Fla. Aug. 2, 2018).

MVP argues that Noble should not be permitted to testify about damages because he did not make the adjustments necessary for a reliable paired sales analysis. Moreover, Noble selected properties in different states and markets that are hundreds of miles apart. The court has previously held challenges to the degree or level of comparability between paired sales goes to the weight of the evidence, not its admissibility. *See Mountain Valley Pipeline, LLC v. 1.30 Acres of Land*, Civil Action No. 7:18-cv-00607, 2019 WL 4306981, at *5 (W.D. Va. Sept. 11, 2019); *Mountain Valley Pipeline, LLC v. 1.81 Acres of Land*, Civil Action No. 7:19-cv-00151, 2019 WL 4007924, at *3 (W.D. Va. Aug. 23, 2019). Thus, the court rejected *Daubert* motions

to exclude paired sales involving conditions other than pipelines, such as high voltage transmission lines or railroads. *See, e.g.*, *1.30 Acres*, 2019 WL 4309681, at *5.

MVP's *Daubert* challenge in this case is different because Noble has not identified pairs of sales that are "as similar as possible." *McCann Holdings*, 111 Fed. Cl. at 626. Thus, Noble is not isolating the effect of an encumbrance, such as a pipeline easement, on similar properties. For example, Noble compares the price of encumbered land in Summers County, West Virginia, which sold for $918 per acre, and a tract without a pipeline in Ablemarle County, Virginia, which sold for $7,212 per acre. (Case No. 7:18-cv-00609, Dkt. No. 23-1 at 80–81.) Noble then failed to make any adjustments to account for the difference in property values in separate real estate markets. Indeed, the twelve unencumbered properties used for comparison range in value from $2,000 to $7,202 per acre. This is not a reliable methodology for measuring the impact of a pipeline easement on property value. *See Cayuga Indian Nation of N.Y. v. Pataki*, 83 F. Supp. 2d 318, 325 (N.D.N.Y. 2000) (excluding expert appraisal using the sales comparison approach because "although in his grids he recognized the possibility of various adjustments, such as location, topography, date of sale, and conditions of sale, in the end he made no adjustments whatsoever").

Next, MVP argues that Noble should not be permitted to testify about pipeline accidents or fear of stigma. Noble is not an expert on pipeline safety, he has no evidence beyond speculation that an accident on the property is reasonably probable and more than speculative, and he has no market evidence linking pipeline safety or accidents to a diminution of market value. Landowners argue that Noble did rely on market evidence connecting pipeline safety, accidents, and fear and stigma associated with pipeline easements to diminution in value— particularly sales of two properties encumbered by MVP easements. There is no evidence

13

linking the alleged diminution of these property sales to fear and stigma as opposed to other factors. Noble's testimony on fear and stigma will be excluded. *See 1.30 Acres of Land*, 2019 WL 4306981, at *5.

Finally, MVP argues that Noble should not be able to testify about potential impacts of the pipeline easements on business operations because such impacts are irrelevant to just compensation. *See Harlan v. Archer*, 79 F.2d 673, 678 (4th Cir. 1935) ("Settled rules of law precluded consequential damages for loss of business or its destruction being considered in determining the value of the land taken . . . ."). Because there is no evidence that such impacts are more than speculative or have caused any diminution of value in the real estate, this aspect of Noble's proposed testimony will also be excluded.

For these reasons, MVP's motion to exclude Noble's expert testimony will be granted.

### F. MVP's Motion in Limine

#### 1. Claims that the pipeline is dangerous or unsafe, evidence of a high consequence area, evidence of other pipeline accidents or incidents

MVP argues, and the court agrees, that this evidence should be excluded for the same reasons set forth in MVP's motion to exclude Noble's testimony.

#### 2. Evidence of other appraisals

Landowners contend that evidence of other appraisals should be allowed to impeach MVP's appraisal experts. MVP maintains that the court should exclude evidence of prior appraisals because their experts have not previously appraised this property and Landowners have not cited any statements in prior appraisals that are inconsistent with their appraisals of this property. Even so, the court will deny the motion to the extent that there may be a proper basis for this evidence to be used for impeachment purposes. The motion will be granted in all other

respects.

**3. Evidence of settlement offers and communications**

Defendants do not intend to offer such evidence. This motion will be dismissed as moot.

**4. Evidence of amounts paid for easements on other properties**

Defendants do not intend to offer such evidence. This motion will be dismissed as moot.

**5. Evidence of alleged impact of or damages from construction**

Landowners argue that evidence of damages to the subject properties resulting from construction or operation of the pipeline should be admitted to the extent it affects the market value of the residue, because every circumstance which affects market value should be considered. Landowners are not entitled to recover damages from construction or operation, however, because compensable loss in the eminent domain context is limited to risks that are inherent in the easement. *1.30 Acres*, 2019 WL 4306981, at *8. This motion will be granted.

**6. Evidence of alleged impact on or damages to the businesses on the property**

MVP argues, and the court agrees, that this evidence should be excluded for the same reasons stated in its motion to exclude Noble's testimony.

## II. CONCLUSION

For the reasons discussed herein, it is HEREBY ORDERED that:

1. Landowners' motion to exclude Wagner and Murphy (Dkt. No. 16 in 7:18-cv-00609, Dkt. No. 17 in 7:18-cv-00611) is DENIED;

2. Landowners' motion to exclude Woods (Dkt. No. 18 in 7:18-cv-00609, Dkt. No. 20 in 7:18-cv-00611) is DENIED without prejudice;

3. Landowners' motion to exclude Thompson (Dkt. No. 20 in 7:18-cv-00609, Dkt. No. 23 in 7:18-cv-00611) is GRANTED;

4. MVP's motion to exclude Noble (Dkt. No. 21 in 7:18-cv-00609, Dkt. No. 18 in the 7:18-cv-00611) is GRANTED; and

5. MVP's motion in limine (Dkt. No. 24 in 7:18-cv-00609 and 7:18-cv-00611) is GRANTED in part and DENIED in part.

Entered: November 12, 2019.

/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
United States District Judge